AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

FILED

MAY 2 5 2018

for the

Eastern District of Missouri

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of

The property and premises located at Discount Tobacco Kings, 6178 Howdershell Rd., Hazelwood, MO 63042, further described as a commercial storefront conducting business as a convenience store. It is a business unit located in the strip mall styled building of Howdershell Plaza. The front of the 6178 Howdershell is white with red brick and includes large pane glass windows and a door. On the top center of the front door is the number 6178. Directly above the front door of 6178 Howdershell on the shingled roof is a white sign with red and black letters that spell out Discount Tobacco King.

Case No.   4:18 MJ 165 DDN

## APPLICATION FOR A SEARCH WARRANT

I, _Kory L. Kuba_____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

The property and premises located at Discount Tobacco Kings, 6178 Howdershell Rd., Hazelwood, MO 63042, further described as a commercial storefront conducting business as a convenience store. It is a business unit located in the strip mall styled building of Howdershell Plaza. The front of the 6178 Howdershell is white with red brick and includes large pane glass windows and a door. On the top center of the front door is the number 6178. Directly above the front door of 6178 Howdershell on the shingled roof is a white sign with red and black letters that spell out Discount Tobacco King.

located in the ____EASTERN____ District of _____MISSOURI_____ , there is now concealed

### SEE ATTACHMENT A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC §§ 1956 and 1957, and 2341 through 2346;<br>18 USC § 371 | Money Laundering  involving the specified unlawful activity of Trafficking in Contraband Cigarettes;<br>Conspiracy |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kory L. Kuba, Special Agent
Internal Revenue Service, Criminal Investigation Division
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   May 25, 2018

_____
*Judge's signature*

City and state:  St. Louis, MO

Honorable David D. Noce, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Kyle T. Bateman

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR
SEARCH AND SEIZURE WARRANTS**

I, Kory L. Kuba, being duly sworn, depose and states as follows:

## I. INTRODUCTION

1.      I am a Special Agent with the Internal Revenue Service, Criminal Investigation Division (IRS-CID) and have been employed as such since 2005.  While employed as a special agent, I have conducted and assisted with criminal investigations concerning violations of the Internal Revenue laws and other federal violations. I am a graduate of the Federal Law Enforcement Training Center where I received classroom and practical training in criminal tax investigations and financial investigations.  I am currently detailed to the Alcohol and Tobacco Tax and Trade Bureau (TTB) to conduct criminal investigations involving tax matters relating to alcohol, tobacco, firearms, and ammunition.

2.      Since December 2017, I have participated in an investigation which is being jointly conducted by IRS-CID and Homeland Security Investigations (HSI), the Illinois Department of Revenue (IDOR-CID), and the Chicago Police Department (CPD).  The investigation is centered on several subjects, including: Jerome Fletcher ("Fletcher"), Carlos Jackson ("Jackson"), and Maurice Genus ("Genus") (the "Target Subjects") who comprise a Contraband Cigarette Trafficking Organization (CTO) and are committing offenses involving (a) Trafficking in Contraband Cigarettes (Title 18, United States Code, Sections 2341 through 2346); (b) Money Laundering related thereto (Title 18, United States Code, Sections 1956 and 1957); and (c) Conspiracy (Title 18, United States Code, Section 371).

3.      Because the information in this affidavit is being submitted for the limited purpose of securing search or seizure warrants for the listed locations, vehicles and/or bank accounts, I

1

have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for search and/or seizure.

## II. LOCATIONS TO BE SEARCHED

4.    This affidavit is submitted in support of an application for search and seizure warrants for the premises listed below (all of which are located within the Eastern District of Missouri) and the items detailed on Attachment "A" related to each location.

    a.    **Discount Tobacco Kings**, 6178 Howdershell Rd., Hazelwood, MO 63042, a commercial storefront conducting business as a convenience store; hereinafter referred to as "**Discount Tobacco Kings**."

    The premises is a business unit located in the strip mall styled building of Howdershell Plaza. The front of 6178 Howdershell faces north across, first, a small parking lot and onwards to Howdershell Road. The front of the 6178 Howdershell is white with red brick and includes large pane glass windows and a door. On the top center of the front door is the number 6178. The roof to the strip mall is black or grey shingles. Directly above the front door of 6178 Howdershell on the shingled roof is a white sign with red and black letters that spell out Discount Tobacco King. On the left of the front of 6178 Howdershell is a dentist office, on the right a nail salon.

    The back of the strip mall and 6178 Howdershell faces south toward I-270, and is red brick with white trim. Directly behind the back of the strip mall is a white gravel parking lot. The back door to 6178 Howdershell is grey and has the number 6178 in black located on the upper center of the door.



2

b. <u>1811 S New Florissant Rd., Florissant, MO 63031</u>, the residence of Stacy Cartage that is rented or leased by Fletcher; hereinafter referred to as the "**New Florissant Premises**."

The premises is located south of I-270 and west of S New Florissant Road. The residence is a single story red brick house with black shingled roof. There are three windows visible on the front of the house. On the left side and right side of the front of the house is a larger window trimmed by tan colored shutters. There is a smaller window to the left of the front door. The front door includes a white trimmed outer storm door and an inner solid in appearance brown door. The driveway is paved black and is located north or to the immediate right of the house, and continues to the back of the house. There is a walkway immediately at the front located north of the house extending from the driveway to the front door. At corner of the walkway and the driveway is a black mail box on a brown post. White numbers "1811" are visible on the mailbox. The premises includes a detached, white sided garage or shed located behind the house and facing the back of the house.



c. <u>5618 Village Royale Ln., Apt. A, St. Louis, MO 63128</u>, the residence of Amanda Luedde and Fletcher; hereinafter referred to as the "**Village Royale Premises**."

The premises is a ground level apartment located near the intersections of Tesson Ferry Road, Duessel Lane, and Village Royale Lane in the Village Royale Apartment Complex. Apartment A is on the lower right side of a tan sided apartment building facing Village Royale Lane. The door to apartment 5618A is painted green and located below and to the right of stairs, and directly to the left of a set of grey metal mailboxes. Above the grey metal mailboxes and immediately to the right of the green door to Apartment 5618A are black numbers and letters 5618A.

3



## III.VEHICLES AND BANK ACCOUNTS TO BE SEIZED

5.     This affidavit is also submitted in support of an application for seizure warrants to

seize vehicles, listed in Attachment B, used to support the goals of the CTO. The following

vehicles are submitted for seizure:

> a. 2011 Ford F350 Super Duty ("**Ford F350**"), a vehicle used by Fletcher. The
> Ford F350 bears Michigan license plate CC85984 and VIN #
> 1FT8W3BT4BEC10360. The Ford F350 is registered to Fletcher at 1331 S
> Zeeb Rd., Ann Arbor, MI 48103.
>
> b. 2015 Interstate Trailer ("**Interstate Trailer**"), a trailer used by Fletcher. The
> Interstate Trailer bears Michigan license plate D213706 and VIN #
> 1UK500F29F1084493. The Interstate Trailer is registered to Fletcher at 16192
> Pineview Ct., Presque Isle, MI 49777.
>
> c. 2015 Chevrolet Silverado ("**Chevrolet Silverado**"), a vehicle used by Genus.
> The Chevrolet Silverado bears Illinois license plate 2109333B and VIN #
> 3GCUKTEC3FG147207. The Chevrolet Silverado is registered to Arturo
> Martinez, Jr., and Jackson at the **Wrightwood Residence**.
>
> d. 2018 Patriot Trailer ("**Patriot Trailer**"), a trailer used by Genus. The Patriot
> Trailer bears Illinois temporary license plate 132U068 and VIN #
> 4YMBC1016JM009260. The Patriot Trailer is registered to Genus at 16216
> Winchester Ave., Markham, IL 60428.
>
> e. 2018 GMC Sierra Denali ("**GMC Sierra**"), a vehicle used by Jackson. The
> GMC Sierra bears Illinois license plate 2135414B and VIN #

4

3GTU2PEJ4JG110732.  The GMC Sierra is registered to Carol Braz at a residence at 8240 Latrobe Ave., Burbank, IL 60459.

6.     This affidavit is also submitted in support of an application for seizure warrants for bank accounts listed in Attachments C and D.  Those accounts have been utilized by members of the CTO to acquire contraband cigarettes for the CTO, to launder the proceeds of the CTO, and/or hold proceeds of the CTO and property involved in money laundering.

**IV. LEGAL BACKGROUND**

A.     Contraband Cigarettes

7.     Title 18, United States Code, Section 2342(a) makes it unlawful for any person to knowingly ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes. Additionally, Title 18, United States Code, Section 2342(b) makes it unlawful for any person knowingly to make any false statement or representation with respect to the information required by Chapter 114 of Title 18 to be kept in the records of any person who ships, sells, or distributes any quantity of cigarettes in excess of 10,000 in a single transaction.

8.     "Contraband cigarettes" is defined as a quantity in excess of 10,000 cigarettes which bear no evidence of the payment of applicable state or local cigarette taxes in the state or locality where such cigarettes are found, if the state or local government requires a stamp, impression or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in possession of a person other than someone exempted under Title 18, United States Code, Section 2341(2)(A)-(D).

9.     I am aware that there are twenty cigarettes in a pack and ten packs of cigarettes in a carton (200 cigarettes in a carton). The cigarette industry refers to thirty cartons (300 packs or 6,000 cigarettes) as a half-case.  Sixty cartons (600 packs or 12,000 cigarettes) are referred to as a

5

master case.  Cigarette manufacturers deliver master cases to wholesalers where the master cases are cut in half, thereby creating a half-case, for the purpose of applying the appropriate tax stamp(s).

10.     All States, excluding North Carolina, South Carolina, and North Dakota, require cigarettes purchased by a wholesaler for resale to have a tax stamp to be sold to a retail outlet.  As such, a wholesaler must also have a license from each state for which they are tax-stamping cigarettes.  According to the Missouri Department of Revenue (MODOR), Discount Tobacco Kings is not registered with the State of Missouri as a tobacco wholesaler; therefore, the business is required to sell cigarettes and apply the applicable sales tax.

11.     In addition to state tax, some local jurisdictions impose a tobacco excise tax on cigarettes.  The amount of the tax varies by state and local jurisdiction.  For example, the state-local per pack tax rate for St. Louis City, MO is $0.24, while the state-local per pack tax rate for St. Louis County, MO is $0.22.  The highest combined state-local tax rate is $6.16 per pack in Chicago, IL.  Therefore, cigarettes acquired in a low tax state such as Missouri, and subsequently sold in a higher tax locality such as Chicago, can generate a substantial illegal financial gain for the traffickers when the required taxes in the consumer state are circumvented.

12.     Cook County of Illinois heavily regulates the tobacco sales within the county for tax benefit purposes.  For example, Cook County Tobacco Tax Ordinance Sec. 74-435 makes it unlawful to engage in the sale, possession, or use of, *inter alia*, improperly stamped packs, unstamped packs, and illegal imports/export, and further makes it a violation for any retail tobacco dealer to hinder or prevent an authorized Department of Revenue representative from performing an inspection or audit.  Violations could result in penalties of $2,000 per offense depending on the

specifics of the violation. Additionally, Cook County Tobacco Tax Ordinance Sec. 74-439 requires retail tobacco dealers to make and maintain records related to the purchase, delivery, inventory reconciliation, and taxes of cigarettes, and to make such records available to the state on request for inspection, audit and/or copying.

      B.     Money Laundering

     13.    Title 18, United States Code, Section 1956(a)(1) makes it illegal to conduct financial transactions with the proceeds of a specified unlawful activity, including violations of Title 18, United States Code, Sections 2341, 2342 and/or 2343, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, and knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, or knowing that the transaction is designed in whole or in part to avoid a transaction reporting requirement under state or federal law.

     14.    Title 18, United States Code, Section 1957 makes it illegal to knowingly engage and attempt to engage in a monetary transaction (deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution) in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

      C.     Forfeiture

     15.    The proceeds of cigarette trafficking (in violation of 18 U.S.C. § 2342) are subject to forfeiture under both civil and criminal authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to violations of

18 U.S.C. § 2342 is subject to civil forfeiture.  In addition, 28 U.S.C. § 2461(c) provides that, "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain forfeiture of property "as part of the sentence in the criminal case."  Thus, pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to cigarette trafficking is subject to criminal forfeiture.

16.     In addition, any vehicle involved in transporting contraband cigarettes is subject to both criminal and civil forfeiture pursuant to 49 U.S.C. § 80303 and 28 U.S.C. § 2461.

17.     Any property involved in a money laundering offense (in violation of 18 U.S.C. §§ 1956 or 1957) is subject to forfeiture under both civil and criminal forfeiture authorities.  Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to civil forfeiture.  In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to criminal forfeiture.  Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime.  These forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources.

18.     This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could be placed beyond process if not seized by warrant.

19.     Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized by a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action

8

against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. A civil forfeiture action may be brought in any district where "acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A). As detailed below, acts or omissions in furtherance of the cigarette trafficking and money laundering scheme under investigation occurred in the Eastern District of Missouri. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. 21 U.S.C. § 853(f) provides authority for the issuance of a seizure warrant for property subject to criminal forfeiture.

20.     Finally, 18 U.S.C. § 984 allows the United States to seize for civil forfeiture identical substitute property found in the same place where the "guilty" property had been kept. For purposes of Section 984, this affidavit need not demonstrate that the funds now in the target accounts are the particular funds involved in the fraud and money laundering violations, so long as the forfeiture is sought for other funds on deposit in that same account. Section 984 applies to civil forfeiture actions commenced within one year from the date of the offense.

21.     Based on the foregoing, the issuance of seizure warrants is authorized under 21 U.S.C. § 853(f) and 18 U.S.C. § 982(b)(1) for criminal forfeiture; and 18 U.S.C. § 981(b) and 984 for civil forfeiture. Notwithstanding the provisions of Rule 41(a) of the Federal Rules of Criminal Procedure, the issuance of this seizure warrant in this district is appropriate under 18 U.S.C. § 981(b)(3) and 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in the Eastern District of Missouri.

9

## V. **THE INVESTIGATION**

22.     The Target Subjects have engaged, since at least September 2016, in the acquisition of Missouri tax stamped cigarettes from national warehouse stores (i.e. Sam's Club and Costco) located within the greater St. Louis, MO area, for transport to and sale within the Chicago, IL area. As detailed below, the purchases of the cigarettes are accomplished by utilizing substantial amounts of cash, checks, debit cards, credit cards, cash value cards, wire transfers or other financial instruments that are associated with the Target Subjects and/or to companies/corporations associated with them. The cigarettes are then transported to Illinois by vehicle, stored in various "stash locations," and eventually sold illegally in Illinois.  The transport and storage of bulk contraband cigarettes and cash proceeds has been surveilled in Missouri and Illinois by investigators through various methods, including video surveillance, physical surveillance, and tracking devices.

23.     The Target Subjects own and operate a convenience store named **Discount Tobacco Kings** in Hazelwood, MO, as well as a convenience store named Burbank Food Liquor & Deli in Burbank, IL; both of which are utilized to commit the target offenses.   Additional investigation shows that:

> a.  **Discount Tobacco Kings** is a Missouri limited liability company that was organized by Fletcher on or about August 27, 2016, using the address of a residence previously owned by Jackson in Burbank, IL.
>
> b.  Burbank Food Liquor & Deli is an Illinois corporation formed by Jackson on or about January 9, 2006, using the addresses of Burbank Food Liquor & Deli. Jackson is listed as the President and Elba Jackson is listed as Secretary of the corporation.

10

    c.  Discount Tobacco Kingdom is a Missouri limited liability company that was organized by Fletcher on or about September 30, 2017 using the address of the **New Florissant Premises**.  A physical storefront for this company does not exist and it appears the company was only created to acquire Missouri tax stamped cigarettes for the CTO.

## VI. SUMMARY OF CIGARETTE PURCHASES BY THE CTO

24.    Between September 2016 and April 27, 2018, the CTO purchased approximately 178,191 cartons of cigarettes from Sam's Club for approximately $8,171,936.  Between September 2016 and April 19, 2018, the CTO purchased approximately 133,280 cartons of cigarettes from Costco for approximately $6,462,793.  In total then, from September 2016 until April 2018, the CTO purchased approximately 311,471 cartons of cigarettes for approximately $14,634,729.

25.    The cigarette excise tax loss to the State of Illinois ($1.98 per pack) is approximately $6,167,125 and the loss to Cook County, IL ($3.00 per pack) is approximately $9,344,130; for a total tax loss of approximately $15,511,255.  Additional tax loss may result on packs of contraband cigarettes sold in the City of Chicago ($1.18 per pack).

26.    To gain entry to either Sam's Club or Costco one must be a member and be issued a membership photo ID card that must be displayed at entry and at check out to register purchases. At Sam's Club and Costco, all purchased items (including cigarettes) are electronically documented and stored via the stores' point of sale equipment/programs.  The recorded information includes the store location of the purchase, date/time of the purchase, the membership account and card number utilized for the purchase which assigns the purchase to a specific individual/business, a description of each of the purchased items, the individual price of each item

11

and the method(s) of payment for the total purchase.  This detailed purchase information along with in-store video of these purchases, when available, has been supplied to investigators by request and/or legal service from September 2016 through May 2018.

27.     Subpoena returns from Sam's Club and Costco shows that Fletcher is primarily responsible for the collection of bulk quantities of cigarettes by using business accounts in the name of **Discount Tobacco Kings** and Discount Tobacco Kingdom.  Through prior investigative experience in the area of contraband cigarette acquisition and distribution, physical and video surveillance analysis and other investigative techniques, I know that nearly every carton purchased by Fletcher was intended for contraband distribution.

28.     As set forth below, the cigarettes purchased at Sam's Club and Costco were made using a variety of sources, including cash, debit cards, and credit cards.  Generally speaking, there appears a trend wherein the cigarettes were initially primarily purchased with cash, but then, over time, Fletcher began to use debit cards and credit cards.  Many of these debit cards are held in the names of various third parties and have specific credit limits.  In reviewing the bank records related to these debit cards and credit cards, I observed a pattern wherein a card would be used to make a purchase that would max the credit limit, and then a payment would be made on the cards almost immediately to allow for additional purchases.

29.     Below is a description of the cards used to make purchases:

   a.   Bank of America debit card with account number ending 3984, which is under bank account number ending 8739 in the name of **Discount Tobacco Kings** at the address of **Discount Tobacco Kings**.

   b.   Bank of America debit card with account number ending 4147, which is under bank account number ending 8739 in the name of **Discount Tobacco Kings** at the address of **Discount Tobacco Kings**.

12

c.  Bank of America credit card with account number ending 9496, which is under credit card account number ending 9571 in the name of **Discount Tobacco Kings** at the address of **Discount Tobacco Kings**.

d.  Bank of America debit card number ending 5239, which is under bank account number ending 8739 in the name of **Discount Tobacco Kings** at the address of **Discount Tobacco Kings**.

e.  Bank of America debit card with account number ending 5221, which is under bank account number ending 8739 in the name of **Discount Tobacco Kings** at the address of **Discount Tobacco Kings**.

f.  Bank of America card number ending 5635.  The subpoenaed records are outstanding.

g.  Bank of America debit card number ending 0381, which is under bank account number ending 5316 in the name of Discount Tobacco Kingdom at the address of **Discount Tobacco Kings**.

h.  Citibank credit card with account number ending 0616 in the name of Liliana Villanueva at 5411 N Meade Ave., Chicago, IL 60630 was established on October 1, 2016 with a credit limit of $20,000;

i.  Citibank credit card with account number ending 9710 in the name of Arturo Martinez at 4953 W. Wrightwood Ave., Chicago, IL 60639 was established on October 10, 2016 with a credit limit of $19,500;

j.  Citibank credit card with account number ending 5045.  Citibank did not locate this credit card.

k.  Citibank debit card with account number ending 0030 in the name of Juana Miguel at 4927 W Fletcher, Chicago, IL 60641 was established on October 28, 2017 with a credit limit of $13,000.

l.  Citibank credit card with account number ending 5722 in the name of Carol Braz at 3201 W. George St., Apt. 2, Chicago, IL 60618 was established on October 7, 2017 with a credit limit of $14,500.

m.  Citibank debit card with account number ending 8984 in the name of Elvira M. Ledezma at 4953 W. Wrightwood Ave., Chicago, IL 60639 was established on October 28, 2017 with a credit limit of $3,500.

13

n. <u>Citibank debit card on account number ending 9893</u> in the name of Hugo Henriquez at 7716 Ostrom Ave., Lake Balboa, CA 91406 was established on June 27, 2016 with a credit limit of $7,500.

o. <u>Discover credit card with account number ending 1230</u>. Discover did not locate this credit card.

p. <u>First Midwest Bank debit card number ending 0252</u>, which is under bank account number ending 4045 in the name of Burbank Food Liquor & Deli at the address of Burbank Food Liquor & Deli.

q. <u>First Midwest Bank debit card number ending 0203</u>, which is under bank account number ending 4045 in the name of Burbank Food Liquor & Deli at the address of Burbank Food Liquor & Deli.

r. <u>First National Bank Texas debit card number ending 0251</u>, which is under bank account number ending 0579 under the name of Debra Hart at 9616 Rogano Ct., Killeen, TX 76542.

s. <u>JPMorgan Chase debit card with account number ending 8191</u>, which is under bank account number ending 1755 in the names of Jackson and Francisco Jackson at the address of 8240 Latrobe Ave., Burbank, IL 60459.

t. <u>JPMorgan Chase debit card with account number ending 5202</u>. The subpoenaed records are outstanding.

u. <u>JPMorgan Chase debit card with account number ending 6411</u>. The subpoenaed records are outstanding.

v. <u>JPMorgan Chase debit card with account number ending 9397</u>. The subpoenaed records are outstanding.

w. <u>JPMorgan Chase debit card with account number ending 3934</u>. The subpoenaed records are outstanding.

x. <u>JPMorgan Chase debit card number ending 5553</u>, which is under bank account number ending 0887 in the name of **Discount Tobacco Kings** at the address of **Discount Tobacco Kings**.

y. <u>JPMorgan Chase debit card number ending 5561</u>, which is under bank account number ending 0887 in the name of **Discount Tobacco Kings** at the address of **Discount Tobacco Kings**.

14

z. PNC Bank debit card with account number ending 2464, which is under bank account number ending 0707 in the name of Jackson at the address of 8240 Latrobe Ave., Burbank, IL 60459.

aa. PNC Bank debit card with account number ending 8710, which is under bank account number ending 2909 in the name of Burbank Food Liquor & Deli at the address of Burbank Food Liquor & Deli.

bb. PNC Bank debit card with account number ending 5991, which is under bank account number ending 1318 in the name of ATP Painting at 1331 S Zeeb Rd., Ann Arbor, MI 48103.

cc. PNC Bank debit card with account number ending 8375, which is under bank account number ending 2909 in the name of Burbank Food Liquor & Deli at the address of Burbank Food Liquor & Deli.

dd. US Bank debit card with account number ending 2732, which is under bank account number ending 4366 in the name of Kelly Wojciechowski at 7935 S Kostner Ave., Chicago, IL 60652.

## VII.   BANK ACCOUNTS USED BY THE CTO

30.     As set forth above, the Target Subjects have utilized numerous credit and debit cards linked to bank accounts in connection with the illegal activities described in the other portions of this affidavit.  Investigators have identified several types of accounts that have been involved in the illegal activity, as follows:

a. Bank accounts that funded the purchase of cigarettes at Sam's Club and Costco;

b. Debit cards linked to the bank accounts used to purchase cigarettes at Sam's Club and Costco; and

c. Credit card accounts in the names of third parties used to purchase cigarettes at Sam's Club and Costco.

31.     As explained in detail below, funds in each of these accounts are subject to forfeiture in the amounts set forth below and in Attachments C and D, because they constitute

15

proceeds of the CTO illegal activities and/or because they are involved in the laundering of said proceeds.

32.     The relationships among related Sam's Club and Costco membership accounts and the bank accounts and credit card accounts used are complex.  These patterns are not typical for a lawful business.  Instead, the complex nature of the transactions suggests that the purpose of such transactions is to conceal the funding sources for the purchase of cigarettes and to promote the continuation of the criminal activity.

33.     Investigators have identified a money laundering scheme employed in which funds from bank accounts were commingled with quantities of cash proceeds at the point of sale to complete purchases of Missouri tax stamped cigarettes.  This method was prevalent in late 2016 and most of 2017.  Investigators analyzed those bank accounts and identified numerous transactions in which cash was used as part of the payment at the point of sale.  In some of these transactions, Fletcher used cash in combination with a check, an electronic payment, and/or a debit card associated with one or more of the bank accounts to complete the transaction.  Fletcher also sometimes used cash in combination with credit cards to complete the transactions and then paid the balances on those credit cards using funds from one or more of the bank accounts.

34.     Each of the specified bank accounts has been examined for evidence of money laundering as described above for the time period of September 2016 through April 2018.  From that detailed analysis, investigators have identified two bank accounts currently open at two different banks where funds from those bank accounts were used to fund cigarette purchases at Sam's Club and/or Costco and are subject to seizure and forfeiture in connection with the foregoing violations, as detailed below.

16

*JPMorgan Chase Bank account number 250850887*

35.     On or about December 28, 2017, JPMorgan Chase business checking account number 250850887 ("**JPM 0887**") was opened at the branch location of 4730 W 79th St., Chicago, IL 60652 with a title of **Discount Tobacco Kings** and with a business address of the **Discount Tobacco Kings**.  Fletcher and Jackson hold signature authority.

36.     **JPM 0887** is a money laundering account used by the CTO in a variety of ways, described as follows:

      a.  Cash proceeds of illegal activity were deposited into **JPM 0887** at various branches in the Chicago area oftentimes in amounts in excess of $10,000;

      b.  Checks and/or electronic checks were written from **JPM 0887** to purchase cigarettes at Sam's Club and Costco in the St. Louis area;

      c.  Debit cards ending 5561 and 5553 are linked to **JPM 0887** and were used to purchase cigarettes at Sam's Club and Costco in the St. Louis area;

      d.  Debit card ending 5553 was used to pay off the balances of other credit cards in third parties' names used by the CTO to purchase cigarettes at Sam's Club and Costco in the St. Louis area.

37.     During the period of January 8, 2018 through March 30, 2018, approximately $445,995 in cash was deposited through Chicago area ATM's into **JPM 0887**.  In addition, counter deposits were made into **JPM 0887** in the amount of approximately $1,823,115.  The total deposits made into **JPM 0887** to date in 2018 are approximately $2,269,110.

38.     During the same period, checks were written from **JMP 0887** in the amount of approximately $913,743 to purchase cigarettes at Sam's Club and Costco in the St. Louis area.

17

Debit cards ending 5561 and 5553 were used in the amount of approximately $1,067,945 to purchase cigarettes at Sam's Club and/or Costco in the St. Louis area.  Debit card ending 5553 was used in the amount of approximately $747,830 to pay off the balances of credit cards in third parties' names, which were used to purchase cigarettes at Sam's Club and/or Costco.

### *First Midwest Bank account number 8100504045*

39.     On or about April 19, 2017, First Midwest Bank business checking account number 8100504045 ("**FMB 4045**") was opened with the title of Burbank Food Liquor & Deli and with a business address of the Burbank Food Liquor & Deli.  Jackson, as the president, and Wojciechowski, as the business manager, hold signature authority.  Debit card ending 0252 is linked to **FMB 4045**.

40.     **FMB 4045** is a money laundering account that is used to comingle illegal proceeds of cigarette sales with income of Burbank Food Liquor & Deli.  **FMB 4045** is used by the CTO to purchase Missouri tax stamped cigarettes at Costco in the St. Louis area.  During the period of July 7, 2017 through January 12, 2018, debit card ending 0252 was used approximately 43 times to purchase cigarettes at Costco under the Discount Tobacco Kings membership account ending 2173 in the amount of approximately $80,992.

### VIII.    ADDITIONAL BASIS FOR SEARCHES OF SPECIFIC LOCATIONS

41.     The discussion below has been organized in such a way as to be individualized to each location to be searched.  Each section will provide an overview of the pertinence of the location and summaries of incidents, surveillances, and/or relevant records.

*__Premises of Discount Tobacco Kings, 6178 Howdershell Rd., Hazelwood, MO 63042__*

State of Missouri Records

42.     On or about August 27, 2016, Discount Tobacco Kings registered with the Missouri Department of Revenue (MODOR) to obtain a tax identification number, listing Fletcher as a member of the business with a business address of the **Discount Tobacco Kings**. The business activity listed was "sale of tobacco products" with a sales begin date of October 1, 2016.   On or about the same date, Articles of Organization were filed by Fletcher using an address in Burbank, IL.

Sam's Club and Costco Membership Accounts

43.     On or about September 20, 2016, Sam's Club tax-exempt membership account number ending 2910 was created for **Discount Tobacco Kings** by Fletcher using the **Discount Tobacco Kings** address.  The business class was reported as "manufacturer of misc products." One card was issued to Fletcher using an address in Burbank, IL and his phone number of 734-216-2826, which was registered with Verizon Wireless using an address in Ann Arbor, MI.  Two cards were issued to Jackson using the Discount Tobacco Kings address.

44.     On or about April 11, 2018, Sam's Club tax-exempt membership number ending 0295 was created for Discount Tobacco Kingdom by Fletcher using the address of 6654 Mexico Rd., St. Peters, MO 63376.  The business class was reported as "retailer of groceries."  One card was issued to Fletcher using an address in Ann Arbor, MI.

45.     On or about September 20, 2016, Costco tax-exempt membership number ending 2173 was created for Discount Tobacco Kings by Fletcher using the **Discount Tobacco Kings** address.  One card was issued to Fletcher.

19

46.     On or about April 10, 2018, Costco tax-exempt membership number ending 2933 was created for Discount Tobacco Kingdom by Fletcher using the address of 6654 Mexico Rd., St. Peters, MO 63376.  One card was issued to Fletcher.

Probable Cause

47.     Since September 2016, Fletcher has purchased vast quantities of cigarettes using the **Discount Tobacco Kings** account at Sam's Club and Costco.  Between September 2016 and April 27, 2018, the CTO purchased approximately 178,191 cartons of cigarettes from Sam's Club for approximately $8,171,936; primarily using the **Discount Tobacco Kings** membership account. Between September 2016 and April 19, 2018, the CTO purchased approximately 133,280 cartons of cigarettes from Costco for approximately $6,462,793; primarily using the **Discount Tobacco Kings** membership account.  These amounts greatly exceed the reported taxable sales to MODOR by **Discount Tobacco Kings**.  For the period of October 2016 through November 2017, **Discount Tobacco Kings** reported a total amount of taxable sales of approximately $22,593 and a tax due amount of approximately $2,105.  In addition, **Discount Tobacco Kings** did not file a corporation income tax return for the tax year 2016.

48.     Fletcher opened business bank accounts at Bank of America, JPMorgan Chase Bank, and PNC Bank using the address of **Discount Tobacco Kings**.  For example, Bank of America account ending 8739 with the **Discount Tobacco Kings** address was used as a money laundering account by the CTO to fund the purchase of Missouri tax stamped cigarettes until the account was closed by Bank of America on or about January 22, 2018; and the JPMorgan Chase account ending 0887 with the **Discount Tobacco Kings** address is currently being used as a money laundering account by the CTO to fund the purchase of Missouri tax stamped cigarettes.

20

49.     Beginning on February 16, 2018, video surveillance of **Discount Tobacco Kings** began.  Throughout this period, the investigation team routinely observed the delivery of bulk cigarettes by Fletcher into the back door of **Discount Tobacco Kings** and the pickup up of cigarettes by couriers identified as Jackson, Genus, and others unknown from the Chicago area.

50.     During the period of February 16, 2018 and May 2, 2018, Fletcher delivered approximately 1,002 half-cases (approximately 30,060 cartons) of cigarettes into the back door of **Discount Tobacco Kings**.  Fletcher used various vehicles to deliver cigarettes, such as the **Ford F350**, the **Interstate Trailer** (pulled behind the **Ford F350**), and several different Enterprise rental minivans.  Jackson, Genus, and others using the **Chevrolet Silverado**, **Patriot Trailer**, and the **GMC Sierra**, picked up approximately 991 half-cases (approximately 29,730 cartons) of cigarettes from the back door of **Discount Tobacco Kings**.

51.     Fletcher used the **Ford F350** to deliver cigarettes on at least seven occasions while under video surveillance.  In addition, the **Interstate Trailer**, which was pulled behind the **Ford F350**, was used to deliver cigarettes on at least four occasions while under video surveillance. Fletcher is routinely seen holding his mobile phone to his ear when exiting his vehicle and moving cigarettes into **Discount Tobacco Kings**.  The most recent delivery with the **Ford F350** and the **Interstate Trailer** occurred on May 21, 2018.  Following this delivery, cigarettes were picked up from **Discount Tobacco Kings** by Genus using the **Chevrolet Silverado** and transported to the Chicago area.

52.     During the period of February 16, 2018 to May 2, 2018, Genus or an unknown female used the **Chevrolet Silverado** at least 14 times and the **Patriot Trailer** at least eight times to pick up cigarettes at **Discount Tobacco Kings** and transport the cigarettes to Illinois.  The most

21

recent pick up of cigarettes using the **Chevrolet Silverado** occurred on May 21, 2018 and the **Patriot Trailer** occurred on May 16, 2018.

53.     During the period of February 16, 2018 to May 2, 2018, Jackson used the **GMC Sierra** at least five times to pick up cigarettes at **Discount Tobacco Kings** and transport the cigarettes to Illinois.  The most recent pick up of cigarettes using the **GMC Sierra** occurred on April 23, 2018.

### *Premises of 1811 S New Florissant Rd., Florissant, MO 63031*

#### State of Missouri Records

54.     On or about September 30, 2017, Articles of Organization were filed by Fletcher for Discount Tobacco Kingdom LLC as a retail tobaccor [sic].  Fletcher as the registered agent and organizer listed the address of the **New Florissant Premises**.  The investigation team has not located an actual storefront for Discount Tobacco Kingdom and it appears Fletcher organized this company to strictly purchase Missouri tax stamped cigarettes for the CTO.

#### St. Louis County, MO Property Records

55.     St. Louis County, MO records show the Keeven Family Partnership owns the **New Florissant Premises**.  I believe Fletcher rents or leases the residence and Stacy Cartage, a clerk at **Discount Tobacco Kings**, resides at the **New Florissant Premises**.

#### Probable Cause

56.     During the investigation, physical surveillance showed Fletcher used the **New Florissant Premises** to conduct contraband cigarette sales.  On or about April 4, 2017, Fletcher opened an account with Ameren Missouri for the **New Florissant Premises**.  Cartage used the

22

**New Florissant Premises** as the address on her Missouri driver's license, which expires on September 20, 2024.

57.     On January 17, 2018, a physical surveillance team observed a Toyota registered to Vincent Naccarato in Mt. Prospect, IL drop off Stacy Cartage at **Discount Tobacco Kings** in the morning when the store opened.  (Physical surveillance teams in the Chicago area observed Naccarato at the Burbank Food Liquor & Deli, exchanging cash, and meeting with others involved in the CTO.)  The vehicle departed and travelled to several places including the **New Florissant Premises** where it parked behind the residence.  At closing time, the vehicle returned to **Discount Tobacco Kings** and picked up Cartage.  The vehicle then returned to the **New Florissant Premises** and parked behind the residence.

58.     On March 14, 2018, Fletcher purchased approximately 620 cartons of cigarettes at Sam's Club for approximately $31,874.  On March 15, 2018, Fletcher purchased approximately 500 cartons of cigarettes at Sam's Club for approximately $25,770.  On this same date, GPS tracking data indicated the **Chevrolet Silverado** departed from the Chicago area and travelled to or near the **New Florissant Premises**.  A physical surveillance team identified Genus as the driver and observed the **Chevrolet Silverado** back into a garage or shed located behind the **New Florissant Premises**.  About 10 minutes later the **Chevrolet Silverado** departed from the **New Florissant Premises** and travelled on I-270 eastbound into Illinois.  Immediately after the **Chevrolet Silverado** departed, a Dodge minivan rented from Enterprise by Fletcher backed out of the garage or shed and departed from the residence.  GPS tracking data shows the **Chevrolet Silverado** returned to the Chicago area and was located at or near the Public Storage Unit 1116, a

stash location for contraband cigarettes, and later at 4330 W. Park Ln. Dr., Apt. 1C, Alsip, IL, the residence of Genus.

59.     On March 19, 2018, Fletcher purchased approximately 517 cartons of cigarettes at Sam's Club for approximately $26,603.  On March 20, 2018, GPS tracking data indicated the **Chevrolet Silverado** departed from the Chicago area and travelled to or near the **New Florissant Premises**.  A physical surveillance team observed the **Chevrolet Silverado** back out of the garage or shed located behind the residence and depart from the residence.  Immediately following, a Dodge minivan rented from Enterprise by Fletcher, backed out of the same garage or shed.  The driver, believed to be Fletcher, closed the garage door and then departed from the residence in the Dodge minivan.   The **Chevrolet Silverado** stopped at a Phillips 66 gas station in Florissant, MO and then departed on I-270 eastbound towards Illinois.  At approximately 1:30 PM, a physical surveillance team observed Genus arrive at the Public Storage located at 5200 W 127th St., Alsip, IL 60803.  Genus backed the **Chevrolet Silverado** into a storage unit, later determined to be Public Storage Unit 1116.  About 15 minutes later, Genus departed from the Public Storage Unit 1116 and traveled to his apartment complex where he entered his residence.

### *Premises of 5618 Village Royale Ln., Apt. A, St. Louis, MO 63128*

Probable Cause

60.     The **Village Royale Premises** is the residence of Amanda Luedde and Fletcher.  I believe the apartment is rented by Amanda Luedde.  Luedde's Missouri driver's license lists the **Village Royale Premises**.  Costco and Missouri employment records show Luedde is employed by Costco, working at the same warehouse location in St. Louis where Fletcher purchases bulk cigarettes for the CTO.

24

61.     I believe Fletcher maintains cash, credit and/or debit cards, receipts, and records pertaining to the CTO at his place of residence, the **Village Royale Premises**.  Since at least September 2016, Fletcher has been involved in the laundering of money for the CTO by withdrawing proceeds of illegal activity from bank accounts used by the CTO.  The bank accounts are funded by illegal proceeds of cigarette sales in the Chicago area.  This cash is deposited in the CTO's bank accounts in the Chicago area by Jackson, Wojciechowski, and others involved in the CTO.  Fletcher uses the illegal proceeds to purchase additional cigarettes for the CTO at Sam's Club and Costco in the St. Louis area.  I reviewed Currency Transaction Reports (CTR's), which show the deposit or withdrawal of cash over $10,000 and Forms 8300, Report of Cash Payments Over $10,000 Received in a Trade or Business.  Between September 2016 and December 2016, Fletcher deposited at least $42,948 in cash.  In 2017, Fletcher deposited at least $206,196 in cash and withdrew at least $51,050 in cash.  Between September 2016 and January 2018, Sam's Club/Wal-Mart and Costco reported receiving at least $3,408,145 in cash from Fletcher.  As previously mentioned, Fletcher used other payment methods, such as debit cards and credit and/or debit cards in third parties' names to purchase cigarettes at Sam's Club and Costco.  Also previously mentioned, **Discount Tobacco Kings** reported taxable sales in amounts substantially less than the cash handled by Fletcher in the same periods.  Fletcher failed to file an individual income tax return for the year 2016.

62.     On January 30, 2018, a physical surveillance team observed Fletcher driving the **Ford F350** and pulling the **Interstate Trailer** at a Sam's Club in the St. Louis area.  Fletcher purchased approximately 720 cartons of cigarettes for approximately $36,933 and loaded the half-cases of cigarettes into the **Interstate Trailer**.  Fletcher then travelled to Costco in the St. Louis

area where he purchased approximately 300 cartons of cigarettes for approximately $15,354 and loaded the half-cases into the **Interstate Trailer**. Fletcher then drove to the **Village Royale Premises** and parked the **Ford F350** and **Interstate Trailer** on a lower parking lot; wherein the **Interstate Trailer** contained at least 1,020 cartons of cigarettes. Fletcher entered the apartment building where the **Village Royale Premises** is located within.

63.     On January 31, 2018, at approximately 11:19 AM, Bank of America records show Jackson deposited approximately $34,837 in cash into the Discount Tobacco Kingdom account ending 5316 at a Chicago area branch. At approximately 12:45 PM, a physical surveillance team observed Fletcher exit the **Village Royale Premises** and enter the **Ford F350** with the attached **Interstate Trailer**. At approximately 1:04 PM, Fletcher arrived at a Bank of America branch in the St. Louis area where he made several trips between the Bank of America building and the **Ford F350** while carrying documents. At approximately 1:22 PM, Fletcher purchased a cashier's check payable to Costco in the amount of approximately $16,195 from account ending 5316. At approximately 1:33 PM, Fletcher arrived at Costco where he purchased approximately 323 cartons (about 11 half-cases) of cigarettes for approximately $16,194 and loaded the half-cases into the **Interstate Trailer**. Fletcher then travelled to **Discount Tobacco Kings** and unloaded approximately 30 half-cases from the **Interstate Trailer** and into the back door of **Discount Tobacco Kings**; therefore I know Fletcher was storing half-cases of cigarettes in the **Interstate Trailer** from the previous day. Fletcher then returned to the **Village Royale Premises**.

64.     On March 2, 2018, video surveillance showed Fletcher driving a Nissan SUV leased by Luedde. Fletched unloaded approximately 17 half-cases of cigarettes from the Nissan

SUV and into the back door of **Discount Tobacco Kings**.   On March 5, 2018, the investigation team observed Luedde's Nissan SUV in the parking at the **Village Royale Premises**.

65.     On March 15, 2018, the investigation team observed an Enterprise rental Dodge minivan rented by Fletcher parked in the lot near the **Village Royale Premises**.

66.     On March 16, 2018, a physical surveillance team and an aerial surveillance team observed Genus driving the **Chevrolet Silverado** and Fletcher driving an Enterprise rental Dodge minivan meet at 6654 Mexico Rd., St. Peters, MO where half-cases of cigarettes were moved from the minivan and into the **Chevrolet Silverado**.  Prior to this exchange, on March 15, 2018, Fletcher purchased approximately 401 cartons of cigarettes at Costco for approximately $19,454 and, on March 16, 2018, Fletcher purchased approximately 510 cartons of cigarettes at Sam's Club for approximately $26,203.  After loading the cigarettes in the **Chevrolet Silverado**, Genus departed and travelled into Illinois and on I-55 northbound towards Chicago.   Several hours later, a physical surveillance team observed Fletcher's Enterprise rental Dodge minivan parked in a lot near the **Village Royale Apartment**.

67.     On March 19, 2018, the investigation team observed an Enterprise rental Dodge minivan rented by Fletcher parked in the lot near the **Village Royale Premises**.

68.     Between March 2018 and April 28, 2018, Fletcher rented minivans from Enterprise to transport cigarettes from Sam's Club and Costco to **Discount Tobacco Kings**, the **New Florissant Premises**, and 6654 Mexico Rd., St. Peters, MO for pickup by Jackson, Genus, or others from the Chicago area.  On seven of the rental applications, Fletcher listed the phone number of 314-960-4262.  This AT&T Wireless phone number is registered to Luedde using the address of the **Village Royale Apartment**.

69.     On May 9, 2018, a physical surveillance team observed Fletcher exit the **Village Royale Apartment** with a small duffel bag.

## IX. BASIS FOR SEIZURES OF VEHICLES

70.     Members of the CTO have continually utilized vehicles to transport cigarettes specifically destined for resale to out-of-state couriers and are therefore subject to forfeiture under Title 49, United States Code, Section 80303, which permits seizure and forfeiture of any vehicle used in the transportation of a cigarette involved in a violation of Title 18, United States Code, Section 2342.  This discussion below has been organized in such a way as to be individualized to each vehicle targeted for seizure by warrant.

### *2011 Ford F350 Super Duty ("Ford F350"), Michigan CC85984,*
### *VIN # 1FT8W3BT4BEC10360*

71.     The **Ford F350** bears Michigan license plate CC85984 and VIN # 1FT8W3BT4BEC10360.  The vehicle is registered to Fletcher at 1331 S Zeeb Rd., Ann Arbor, MI 48103.  Fletcher is known by the investigation team to primarily use this vehicle.  This vehicle is used to transport bulk cigarettes for later resale to out-of-state couriers.  Examples for seizure are incorporated in the **Discount Tobacco Kings** section.

### *2015 Interstate Trailer ("Interstate Trailer"), Michigan D213706, VIN #*
### *1UK500F29F1084493*

72.     The **Interstate Trailer** bears Michigan license plate D213706 and VIN # 1UK500F29F1084493.  The trailer is registered to Fletcher at 16192 Pineview Ct., Presque Isle, MI 49777.  Fletcher is known by the investigation team to primarily use this trailer.  This trailer is used to transport bulk cigarettes for later resale to out-of-state couriers.  Examples for seizure are incorporated in the **Discount Tobacco Kings** section.

### *2015 Chevrolet Silverado ("Chevrolet Silverado"), Illinois 2109333B, VIN # 3GCUKTEC3FG147207*

73.     The **Chevrolet Silverado** bears Illinois license plate 2109333B and VIN # 3GCUKTEC3FG147207.  The vehicle is registered to Arturo Martinez, Jr., and Jackson at 4953 W Wrightwood Ave., Chicago, IL 60639.  Genus is known by the investigation team to primarily use this vehicle.  This vehicle is used to transport bulk cigarettes across state lines from Missouri to Illinois for later resale.  Examples for seizure are incorporated in the **Discount Tobacco Kings** section.

### *2018 Patriot Trailer ("Patriot Trailer"), Illinois Temporary 132U068, VIN # 4YMBC1016JM009260*

74.     The **Patriot Trailer** bears Illinois temporary license plate 132U068 and VIN # 4YMBC1016JM009260.  The trailer is registered to Genus at 16216 Winchester Ave., Markham, IL 60428.  Genus is known by the investigation team to primarily use this trailer.  This vehicle is used to transport bulk cigarettes across state lines from Missouri to Illinois for later resale. Examples for seizure are incorporated in the **Discount Tobacco Kings** section.

### *2018 GMC Sierra Denali ("GMC Sierra"), Illinois 2135414B, VIN # 3GTU2PEJ4JG110732*

75.     The **GMC Sierra** bears Illinois license plate 2135414B and VIN # 3GTU2PEJ4JG110732.  The vehicle is registered to Carol Braz at 8240 Latrobe Ave., Burbank, IL 60459; the **Latrobe Residence**.  Jackson is known by the investigation team to primarily use this vehicle.  This vehicle is used to transport bulk cigarettes across state lines from Missouri to Illinois for later resale.  Examples for seizure are incorporated in the **Discount Tobacco Kings** section.

29

## X. **GENERATION OF RECORDS IN SUPPORT OF CRIMINALITY OF THE CTO**

76.     In the normal course of business, businesses maintain records for income, excise, sales, and other types of tax reporting purposes.  Based on my experience with investigating financial crimes, I have previously seen or learned through other agents the types of records maintained by businesses on-site, which includes electronic financial records and/or paper financial records.  I believe the stores will likely maintain such records, which will show actual cigarette sales made to legitimate customers; therefore providing evidence as to the use of their stores to operate their criminal enterprise, the amount of the cigarettes being sold to couriers from out-of-state, and their illicit profits.

77.     Members of the CTO have conducted numerous business transactions, all of which generate substantial "paper" records. For example, each CTO store was required to incorporate or register or be licensed within the jurisdiction where the store lies in order to operate and sell tobacco.  Since the entities were created with a mailing address associated with a specifically named store and/or corporation, one can reasonably assume such paperwork would be stored at the identified location.

78.     Likewise, the filing for and utilization of a bank account, created by a specifically identified member of the CTO, whether it be under the member's name and/or a corporation associated to them, and the use of the account in furtherance of the criminal acts would and does generate substantial "paper records" of the financial operations of the CTO. Records of this nature would include account initiation documents, cancelled checks, deposit slips, counter activity associated to the account, wire transfers to/from the account, as well as debit and credit card issuance and the transactional activity to include the receipt of statements regarding expenditures

on the account of such cards. Again, these statements would produce a detailed accounting of the expenditures in support of the criminal activities of the CTO associated with the account.

79.     When a member of the CTO applies for, and receives, a wholesale club membership from Sam's, a number of items of "records" of evidentiary value are produced. The presentation of the corporate documents to legitimize the business application process, the naming of other members of the CTO with supporting identity documents authorized to utilize the specific business account, as well as the membership identity cards issued by Sam's Club and/or Costco, all represent substantial items of evidence indicating the use of the accounts to purchase cigarettes destined for Chicago.

80.     The purchase of the cigarettes from Sam's Club and Costco generates a printed receipt given to the purchaser. These receipts also represent an expenditure of funds of the CTO which are required to be documented by the management personnel of the CTO. These receipts retained by the purchaser member of the CTO represent substantial evidence as the receipt documents the "who, what where, when and how paid for" details of any specific transaction.

81.     When the Missouri tax stamped cigarettes are transported to Chicago by members of the CTO via personally owned or rental vehicles, a number of items of paper "records" are produced. Specifically, there would be: gas, meals, and if used, rental vehicle expense receipts, generated during the transport process. Each of these expenditures represents a reimbursable expense from the CTO which would increase the need for retention of that document by the transporting CTO member.

82.     As detailed above, the amount of transactions and supporting documents, to include paper receipts acquired by members of the CTO during the furtherance of criminal activities

supporting the CTO, are numerous to say the least. It would not be out of the ordinary for individual members of the CTO, who are performing the outlined activities in support of the criminality of the CTO, to maintain some type of "ledger." Such a recording of expenditures and documenting of activities would assist the CTO member to fully explain their activities and expenses to the upper level of management of the CTO, especially when reimbursement was expected.

## XI.   LOCATION AND EXISTENCE OF RECORDS

83.     Based upon my experience and the investigation team's experience and participation in other contraband cigarette trafficking, tax fraud, money laundering, and economic crime investigations, some involving long-term conspiracies and criminal enterprises comprised of associates in fact, or persons acting criminally to achieve the same results, or using similar methods of commission of these types of crimes, I know:

   a.   That perpetrators of contraband cigarette trafficking, money laundering, tax fraud, and economic crime are the recipients of illegally-generated proceeds, in the form of currency, to include cash, coins, cash equivalents, traveler's checks, or other negotiable notes and financial instruments, systematically generated and intended in part for personal gain, the continued support of the criminal acts of the CTO, and in part, for support of other criminal activity; very often place assets in names other than their own; and often keep said currency in a business(es), storage facility and/or residence which they control or have ready access to, in order to avoid detection of these assets by government agencies;

   b.   That perpetrators of contraband cigarette trafficking, money laundering, tax fraud, and economic crime maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other papers relating to the tracking of income and expenses related to those activities. That the aforementioned books, records, receipts, notes, ledgers, etc. are often maintained where the perpetrator may have ready access to them, typically at their businesses, storage facilities and/or their residences or such locations under their control;

   c.   That perpetrators of contraband cigarette trafficking, money laundering, tax fraud, and economic crime commonly conceal in their business premises, storage facilities and/or their residences, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of their illicit transactions, as

32

well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in criminal contraband cigarette trafficking activities;

d.  That when perpetrators of contraband cigarette trafficking, money laundering, tax fraud, and economic crime amass large proceeds from perpetrators of contraband cigarette trafficking, money laundering, and economic crime, the members of the perpetrators of contraband cigarette trafficking, tax fraud, money laundering, and economic crime organizations frequently attempt to legitimize or conceal these profits. I know that to accomplish these goals, members of contraband cigarette trafficking, money laundering, and economic crime organizations commonly utilize methods including, but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts, and members of the perpetrators of contraband cigarette trafficking, money laundering, and economic crime organizations often maintain, at their business premises, storage facilities and/or their residences, writings and records of use of such methods;

e.  That it is common for members of the perpetrators of contraband cigarette trafficking, money laundering, tax fraud, and economic crime organizations to travel to/from or to contact other co-conspirators supporting their criminal activity or engaged in similar criminal activity elsewhere in and outside the United States in furtherance of their criminal conspiracy. After these contacts, members of the perpetrators of contraband cigarette trafficking, money laundering, and economic crime organization will transport or cause to be transported the proceeds or items of criminal evidence to/from the areas in which the proceeds on items will benefit their perpetrators of contraband cigarette trafficking, money laundering, and economic crime organizations. The methods of transportation used commonly include, but are not limited to, commercial airlines, rental automobiles, private automobiles, and government and contract mail carriers. Using businesses they operate and/or their residences as storage or sales "fronts" for illegality, members of the contraband cigarette trafficking, tax fraud, money laundering, and economic crime organizations (large-scale or otherwise) often use or cause to be used their place of business, their storage facilities and/or their residences, to arrange and keep records, itineraries or writings reflecting such transportation;

f.  That members of the perpetrators of contraband cigarette trafficking, money laundering, tax fraud,  and economic crime organizations commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the perpetrators of contraband cigarette trafficking, tax fraud, money laundering, and economic crime organization, keeping these books and papers in places convenient for the

members of the perpetrators of contraband cigarette trafficking, tax fraud, money laundering, and economic crime organization to access them, such as at his/her place of business, storage facilities and/or their residences;

g.   That members of perpetrators of contraband cigarette trafficking, money laundering, tax fraud,  and economic crime organizations may possess photographs of themselves, their associates, their property and their proceeds and, when such photographs exist, the members of the perpetrators of contraband cigarette trafficking, money laundering, and economic crime organizations usually maintain these photographs in their possession or in places convenient to access them, including among personal effects kept at the their place of business, storage facilities and/or their residences;

h.   That unexplained wealth is probative evidence of crimes motivated by greed, in particular (but not only) from perpetrators of contraband cigarette trafficking, money laundering, and economic crime activities; and

i.   That persons involved in contraband cigarette trafficking, money laundering, tax fraud, and economic crime typically maintain at their business premises, storage facilities and/or their residences, writings and records tending to confirm participation in the perpetrators of contraband cigarette trafficking, money laundering, and economic crime, maintain accounting-type records reflecting debits and credits to identified and unidentified bank accounts, and records of revenue and expenses; and often such persons keep ledgers reflecting profits from their illegal perpetrators of contraband cigarette trafficking, tax fraud, money laundering, and economic crime activities.

## XII.   COMPUTER, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

84.   As described above and in **Attachment A**, this application seeks permission to search for records that might be found on the premises, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

85.   *Probable cause.*  I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

34

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. I am aware that computer equipment was used to generate and print documents used in the money laundering scheme.  There is reason to believe that there is a computer system at least in the form of electronic cash registers currently located on the premises.

86. *Forensic evidence.*  As further described in **Attachment A**, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

a.  Data on the storage medium can provide evidence of a file that was once on the
    storage medium but has since been deleted or edited, or of a deleted portion of
    a file (such as a paragraph that has been deleted from a word processing file).
    Virtual memory paging systems can leave traces of information on the storage
    medium that show what tasks and processes were recently active.   Web
    browsers, e-mail programs, and chat programs store configuration information
    on the storage medium that can reveal information such as online nicknames
    and passwords.  Operating systems can record additional information, such as
    the attachment of peripherals, the attachment of USB flash storage devices or
    other external storage media, and the times the computer was in use. Computer
    file systems can record information about the date's files that were created and
    the sequence in which they were created, although this information can later be
    falsified.

b.  Forensic evidence on a computer or storage medium can also indicate who has
    used or controlled the computer or storage medium.  This "user attribution"
    evidence is analogous to the search for "indicia of occupancy" while executing
    a search warrant at a residence.   For example, registry information,
    configuration files, user profiles, e-mail, e-mail address books, "chat," instant
    messaging logs, photographs, the presence or absence of malware, and
    correspondence (and the data associated with the foregoing, such as file creation
    and last-accessed dates) may be evidence of who used or controlled the
    computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after
    examining this forensic evidence in its proper context, draw conclusions about
    how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other
    forms of forensic evidence on a storage medium that are necessary to draw an
    accurate conclusion is a dynamic process.  While it is possible to specify in
    advance the records to be sought, computer evidence is not always data that can
    be merely reviewed by a review team and passed along to investigators.
    Whether data stored on a computer is evidence may depend on other
    information stored on the computer and the application of knowledge about how
    a computer behaves.  Therefore, contextual information necessary to understand
    other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use,
    who used it, and when, sometimes it is necessary to establish that a particular
    thing is not present on a storage medium.  For example, the presence or absence
    of counter-forensic programs or anti-virus programs (and associated data) may
    be relevant to establishing the user's intent.

36

87.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37

88.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### XIII.   CONCLUSION

89.   Based on the information in this affidavit, I request issuance of search warrants for the locations listed in Section II, which are to be searched for the items described in Attachment A.

90.   I further request warrants to seize the property described in Attachments B, C, and D for forfeiture. As described above, each of the vehicles identified in Attachment B has been involved in the transportation of contraband cigarettes within the meaning of Title 49, U.S.C., § 80302.  Based upon the analysis above, it also appears that each of the bank accounts in those attachments contain criminal proceeds from the aforementioned cigarette trafficking conspiracy in violation of Title 18, U.S.C., § 2342 and/or have been involved in a money laundering conspiracy in violation of Title 18, U.S.C., §§ 1956 and 1957. Funds in those accounts have been involved in the conspiracy either because they themselves constitute proceeds of specified unlawful activity, including cigarette trafficking in violation of Title 18, U.S.C., § 2342 or because they have been commingled or involved with such proceeds in order to conceal the nature, location, source,

ownership, or control of the proceeds of the CTO, and/or to promote the carrying on of the CTO's unlawful activities.

91.     The property so involved is therefore subject to civil and criminal forfeiture under 18 U.S.C. § 981, 18 U.S.C. § 982, 21 U.S.C. § 881, 28 U.S.C. § 2461, and/or 49 U.S.C. § 80303 and is subject to seizure under 18 U.S.C. §§ 981(b) and 982(b). In each case where the property sought to be seized is funds in a bank account, an equal sum of the funds presently in that account are subject to civil forfeiture pursuant to 18 U.S.C. § 984, without regard to their traceability. Because of the mobility of the property and the ease of relocating and/or destroying it, a restraining order pursuant to 21 U.S.C. § 853(e) may not be sufficient to assure the availability of said property for forfeiture.

_____
Kory L. Kuba
Special Agent
Internal Revenue Service, Criminal Investigation Division

SUBSCRIBED AND sworn to before me this ___25th___ day of ___May___, 2018.

_____
United States Magistrate Judge
Eastern District of Missouri

39

**ATTACHMENT A**
**LIST OF ITEMS TO BE SEIZED**


The items to be seized are evidence, fruits, and instrumentalities of offenses involving (a) Money Laundering (Title 18, United States Code, Sections 1956 and 1957) involving the specified unlawful activity of Trafficking in Contraband Cigarettes (Title 18, United States Code, Sections 2341 through 2346); and (b) Conspiracy (Title 18, United States Code, Section 371), and include the following items:

1. Contraband cigarettes, cigarettes illegally possessed, and cigarettes intended for resale to out-of-state couriers.

2. Sam's Club and Costco membership applications, membership cards, and purchase information.

3. Records showing the ordering, purchasing, and selling of cigarettes.

4. All personal and business tax returns, to include income, sales, and excise tax returns.

5. All financial documents, to include financial institution statements, records, checks, cancelled checks, deposits.

6. Domestic and international wire transfer records.

7. Credit/debit card applications, credit/debit cards, credit card bills/statements, credit/debit card receipts of transaction and attempt transactions.

8. U.S. currency.

9. Documentation of personal identifier information and means of identification of 3rd parties.

10. Safes, lock boxes, fire-proof boxes, or other storage containers maintained on the premises.

11. Video surveillance systems, including computer systems and DVR's.

12. Property records and records showing indicia of ownership.

13. Personal electronic media: Telephones, fax machines, speed dialers, cellular telephones, smart phones, PDA's, digital pagers, voice pagers, alpha-numeric display pagers and all information stored therein, either written or electronic — including text messages, emails, address books, calendars.

14. Computer hardware: Computer hardware, including data-processing devices (such as central processing units, desktop computers, self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, floppy disks,

1

external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, thumb-drives, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, routers, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts, that can be used to restrict access to computer hardware (such as physical lock and keys).

15. Computer software: Computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, video, web browsers, and communications programs.

16. Computer documentation: All computer-related documentation including written, recorded, printed, or electronically-stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

17. Password and security information: All computer passwords and data security devices, including encryption devices, chips and circuit boards.

18. Proof of ownership of related vehicles and residences: Indicia of ownership of the premises described above, to include: utility and telephone bills, trash removal statements and bills, cancelled envelopes, real estate tax statements, construction or improvement bills, materials purchase receipts, insurance documents, safety deposit box keys, and personal documents or photographs.